# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

SCOTT LYNN BRAGG,        )
                                   )
        Petitioner,        )
                                   )
        vs.        )     Case number 4:06cv0732 RWS
                                   )                TCM
TROY STEELE,        )
                                   )
        Respondent.        )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

The 28 U.S.C. § 2254 petition of Scott Lynn Bragg ("Petitioner"), a Missouri prisoner serving an aggregate term of twenty-one years' imprisonment, for federal habeas corpus relief is before the undersigned United States Magistrate Judge for a review and a recommended disposition. See 28 U.S.C. § 636(b).

## Background

Carl Scott Ford and Tracie Diane Ford died on August 13, 2002, when the car in which they were passengers struck a tree. (Resp't[1] Ex. A at 8-9.) Carla Jo McNelly, three months pregnant at the time, was injured in the accident. (Id. at 9.) The driver of the car, Petitioner, was charged with two counts of involuntary manslaughter and one count of second degree assault. (Id. at 8-9.) He was also charged with being a prior offender, having previously pled guilty to another charge of second degree assault. (Id. at 9.)

---

[1]Both Petitioner and Respondent submitted the state court record as exhibits. For ease of reference, the Court will cite only to the Respondent's exhibits unless the cited exhibit was submitted only by Petitioner.

Six months later, the trial court heard testimony and arguments on a motion to suppress Petitioner's statements and evidence. (Id. at 13.) The evidence in question was blood tests and a Vetronix sensor device, or "black box," taken from the car Petitioner had been driving. (Id.) McNelly was the first witness to testify. (Id.) She, the Fords, and Petitioner had met at a tavern that night. (Id.) Petitioner had had three beers. (Id. at 13-14.) The four drove around awhile, taking turns driving. (Id. at 14.) At one point, when Petitioner was driving, she "felt like something was going to come up through the floor." (Id. at 14, 15.) The car stopped, with her trapped inside. (Id. at 14.) Somebody helped her get out. (Id.)

A woman who lived near the accident scene testified, among other things, that Petitioner asked her for something to cut the seat belt. (Id. at 15.) A fireman who had responded to the scene testified that Petitioner had explained that he had lost control of the car when headlights from an oncoming car had shone in his eyes and that he had been going approximately 60 miles an hour at the time. (Id. at 17.) A Missouri highway patrolman testified that Petitioner gave him the same explanation . (Id. at 20.) He noticed a smell of alcohol on Petitioner. (Id.) A police officer testified that he smelled alcohol on Petitioner when he first saw him in the ambulance. (Id.) Petitioner gave his consent to be given a field sobriety test with a portable breath tester. (Id.) The test results indicated alcohol. (Id. at 21.) Another police officer testified that he asked Petitioner at the hospital for his consent to have blood drawn, and that Petitioner signed the consent form and submitted to the blood draw. (Id. at 22.) He also made Petitioner aware at the

hospital that he was under arrest.  (Id.)  A third police officer testified that he had interviewed Petitioner the following day, but did not advise him of his *Miranda*[2] rights because he was not under arrest.  (Id. at 27-28.)  Petitioner's explanation of the accident matched that previously given.  (Id. at 28.)

The nurse who drew Petitioner's blood at the hospital after the accident testified that she was present when the police officer asked Petitioner for his consent to have blood drawn and that she followed standard medical procedure when doing so, i.e., she used tap water on a cotton ball to prepare the area.  (Id. at 17.)  Regardless of whether a police officer had asked for the blood draw, it would have been done under standard hospital procedure.  (Id. at 18.)  She recalled that, when asked by the officer to sign a consent form, Petitioner replied that he would have to or he would lose his license.  (Id.)  She drew two blood samples, one was contained in a tube with a gray top, one in a tube with a red top.  (Id. at 18-19.)  The former sample had a preservative because it would be tested at a police crime laboratory; the latter did not because it would be immediately tested at the hospital.  (Id. at 19.)

Another highway patrolman testified that he was at the accident scene after the car's occupants were gone.  (Id. at 23.)  Among the pieces of evidence he collected was a sensing diagnostic module.  (Id.)  The module's main purpose is to deploy air bags when needed.  (Id.)  It also collects data from the car, including the car's speed at one-second intervals beginning five seconds before the air bags deploy and whether the driver's seat

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

belt was fastened.  (<u>Id.</u> at 23, 25.)  In a 1999 Pontiac Firebird, the car driven that night by Petitioner, the module is under the console between the driver's and front passenger's seats.  (<u>Id.</u> at 24.)  The module was "very visible" when the piece of plastic covering it up was lifted.  (<u>Id.</u> at 24, 25.)  The car could not be driven, was impounded, and was towed.  (<u>Id.</u> at 29.)  The car belonged to James Huffman.  (<u>Id.</u> at 27.)

The trial court denied the motion to suppress, finding that Petitioner lacked standing to challenge the warrantless seizure of the module and that the statements and other evidence were admissible as well.  (<u>Id.</u> at 30.)

A few months later, the trial court heard testimony from William Russell Haight of the Collision Safety Institute on the question of whether the data record in the sensory diagnostic module is accepted in the scientific community as accurate and reliable.  (<u>Id.</u> at 31.)   After detailing his professional experience, including accreditation from the Accreditation Commission for Traffic Accident Reconstruction, publications, and testimony in six states and two other countries as an expert witness, Haight described how a sensory diagnostic module worked and how data collected from that module was used in traffic accident reconstructions.  (<u>Id.</u> at 32-42.)  The data collected from the module in the Firebird showed a vehicle speed of 119 miles per hour ("mph") five seconds before algorithm enable (the term for when the "module experiences a severe enough developing crash to wake up and start looking at the data that's coming in"), 118 mph at four seconds, 117 mph at three seconds, 126 mph at two seconds, and 102 mph at one second.  (<u>Id.</u> at 40.)  The module also showed that the brake switch was on at that last second.  (<u>Id.</u>)

The month before Petitioner's jury trial was to begin, he signed in open court a "Petition to Enter a Plea of Guilty." (Id. at 49-51.) This petition provided that he had "received a copy of the information (charge against me). I read the information and have discussed it with my lawyer. I fully understand every charge against me." (Id. at 49.) The petition further provided, in relevant part:

> I know that the Court must be satisfied that there is a factual basis for a PLEA OF GUILTY before my plea can be accepted. I represent to the Court that I did the following acts in connection with the charges against me: On August 13, 2002, I was the operator of an automobile in which Carl Scott Ford, Tracie Diane Ford and Carla Jo McNelly were passengers, and I operated that motor vehicle under the influence of alcohol and did so with criminal negligence by going at high rate of speed on Big Bend Road and causing a collision with a tree, and that resulted in the death of Carl Scott Ford, the death of Tracie Diane Ford, and physical injury to Carla Jo McNelly.

(Id.) Petitioner acknowledged in the petition that he was aware of, and was waiving, certain rights and his possible entitlement to a change of judge. (Id. at 49-50.) He had been informed about the range of punishment and knew that he could receive the same sentence as if he had gone to trial and been convicted by a jury. (Id. at 50.) He also affirmed that his trial counsel had done all that anyone could do to assist him. (Id. at 51.)

That same day, the trial court accepted Petitioner's plea of guilty to the three charges. (Id. at 59, 76.) In return for his plea, the prosecutor agreed to dismiss a felony charge of tampering with a witness, Carla McNelly, and a misdemeanor charge of telephone harassment. (Id. at 59, 62, 63.) The sentences were to be left to the trial court's discretion. (Id. at 62.) Under oath, Petitioner stated that he understood he was giving up certain constitutional rights by pleading guilty and was satisfied with his trial counsel's

assistance.  (Id. at 62, 64-71.)  He also understood that he was facing a possible twenty-one term of imprisonment if he was to receive the maximum sentence on each charge and these sentences were to run consecutively.  (Id. at 71.)  Questioned about the accident, Petitioner stated that he did not own the Firebird, that he had drunk approximately three beers, and that he might have been driving at 90 mph when he lost control of the Firebird and hit a tree.  (Id. at 73-74.)  He remembered going around a curve, losing control of the car, going off the road, and hitting a tree.  (Id. at 74.)  The applicable speed limit was 30 mph.  (Id. at 75.)

The trial court sentenced Petitioner to the maximum term on each charge and ordered that the sentences be served consecutively.  (Id. at 89.)

Petitioner did not appeal.  He did file a timely motion for post-conviction relief pursuant to Missouri Supreme Court Rule 24.035.  (Id. at 95-103.)  The motion was amended once by Petitioner pro se and once by appointed counsel.  (Id. at 105-75.)  He argued in the latter motion that he was denied his constitutional rights when (a) the trial court accepted his plea of guilty although there was no factual basis for the plea, including no facts showing that he was criminally negligent; (b) his trial counsel coerced him into pleading guilty because he could not come up with an additional retainer fee; (c) trial counsel failed to move for a change of judge although the judge had also presided over the related civil suit against Petitioner; (d) trial counsel was ineffective for failing to investigate Bradley Quinn as an expert witness; and (e) trial counsel was ineffective for failing to investigate Carla McNelly as a material witness.  (Id. at 125-30.)

An evidentiary hearing was held at which Petitioner, his wife, his trial counsel, and Quinn testified. (Resp't Ex. B.) Trial counsel testified that he told Petitioner that they would need an expert witness to successfully defend the case if they were to go to trial. (<u>Id.</u> at 9.) They would probably need an accident reconstructionist and an expert on the sensory device modules. (<u>Id.</u>) When Petitioner could not come up with the additional money, trial counsel told Petitioner he could go to the Public Defender's Office and would be provided experts at no cost to him. (<u>Id.</u> at 9, 35, 42-43.) Trial counsel was not going to fund the experts himself. (<u>Id.</u> at 9-10, 45.) Trial counsel had previously worked with an expert in Connecticut on the modules. (<u>Id.</u> at 10.) Trial counsel recognized two letters, one from June 2003 and one from August 2003, that he had sent informing Petitioner that he needed to pay an additional retainer and, if not, they needed to look at an alternative to trial. (<u>Id.</u> at 11-12.) He also represented Petitioner in a civil case arising from the accident. (<u>Id.</u> at 13.) The same judge presided over that case, which ended in a settlement agreement about how money paid into the court by the insurance company was to be divided. (<u>Id.</u> at 14.) Trial counsel and Petitioner discussed moving for a change of judge; however, Petitioner had seen the judge preside over a case with his brother and thought the judge would be "okay." (<u>Id.</u> at 15.) Trial counsel thought the other judge in the circuit might be more lenient, but Petitioner had a favorable impression of the assigned judge and did not want to change. (<u>Id.</u> at 32.) If Petitioner had wanted a change of judge, counsel would have so moved. (<u>Id.</u> at 33.) If Petitioner had wanted to go to trial, he would have. (<u>Id.</u> at 41.) Trial counsel further testified that if McNelly did not change her testimony

from that earlier given it might be helpful.  (<u>Id.</u> at 19-20.)  There was some concern that, because tests had since shown her baby not to be Petitioner's, she might change that testimony.  (<u>Id.</u>)  Regardless, trial counsel's focus was on how to mount a defense against the State's expert testimony.  (<u>Id.</u> at 20-21.)  McNelly was the witness at issue in the tampering charge.  (<u>Id.</u> at 34.)  Trial counsel heard Haight testify at a preliminary hearing and thought he would be an excellent witness.  (<u>Id.</u> at 36.)  He also thought there might be a problem with the sensory diagnostic module because it indicated that Petitioner was not wearing a seat belt, but there had been evidence, i.e., the request for something to cut a belt, that he had been.  (<u>Id.</u> at 37.)  There had been time for them to obtain an expert witness after the preliminary hearing.  (<u>Id.</u>)  He did not remember the name "Brad Quinn" ever being discussed.  (<u>Id.</u> at 45.)

Bradley Quinn testified that he was a senior plant trainer and plant training consultant for General Motors ("GM").  (<u>Id.</u> at 49.)  He had held this position for three years and previously had been employed as a dealership mechanic.  (<u>Id.</u>)  There were several technical bulletins issued by GM about the 1999 Firebird, including some on the brakes.  (<u>Id.</u> at 51, 53.)  At Petitioner's request, he had downloaded a list of the relevant bulletins from the GM website.  (<u>Id.</u> at 53, 54.)  He and Petitioner had been close friends for at least five years.  (<u>Id.</u> at 54.)  Asked if he was familiar with a bulletin about the rear brakes on the Firebird, Quinn replied, "Somewhat."  (<u>Id.</u>)  The rear brakes were making a "chirping" noise when applied; hence, the rear brake pads needed to be replaced.  (<u>Id.</u> at 54-56.)  Another bulletin addressed the torque specifications for the brake calipers on

the Firebird.  (Id. at 58.)  The specifications were lowered from those earlier published; hence, less stress would be placed on the fasteners.  (Id. at 59.)  If trial counsel had asked him, Quinn would have been willing to testify for Petitioner at trial.  (Id. at 59, 60.)  On cross-examination, Quinn further testified that he was not saying that brake problems caused the wreck.  (Id. at 62.)  Asked if he disagreed with the statement by the highway patrol's accident reconstructionist that the wreck was caused by Petitioner driving 117 mph drunk, Quinn testified that he had no opinion to offer.  (Id. at 63.)  He was testifying at the evidentiary hearing because he was a close friend of Petitioner's.  (Id. at 64.)

Petitioner testified that he had not been driving as fast as 90 mph at the time of the accident.  (Id. at 72.)  He had not been read the charges when he pled guilty or was sentenced.  (Id.)  When asked by trial counsel for an additional $5,000, he told counsel that he would see what he could do.  (Id. at 75.)  McNelly had told him that she would try to help with the attorney's fees because she knew the wreck was an accident and that he was not guilty.  (Id. at 76.)  Trial counsel never mentioned the Public Defender's Office. (Id.)  If he had known that he could have retained an expert at the Public Defender's expense, he would have gone that route.  (Id.)  When he and trial counsel initially discussed a change of judge, he told counsel that the judge seemed fair, but he wanted to think about it and get more input from family members and others.  (Id. at 78.)  He knew there was a limited time period in which to request a change of judge and tried to contact counsel to discuss it.  (Id. at 79.)  Ultimately, he decided he wanted a change of judge because he felt that the judge had prejudged the case, having decided in the civil action

who got what amount of money.  (<u>Id.</u> at 80.)  When told of Petitioner's decision, trial counsel just shrugged his shoulders.  (<u>Id.</u>)  Petitioner further testified that he did not think he would have been charged with tampering had trial counsel contacted McNelly as he wished.  (<u>Id.</u> at 83.)  He gave information to trial counsel about the technical bulletins on the Firebird,  about Quinn's willingness to testify, and about how to contact Quinn.  (<u>Id.</u> at 83-84.)  Trial counsel never did.  (<u>Id.</u> at 84.)  On cross-examination, Petitioner explained that he had answered the questions at the change of plea hearing about his satisfaction with trial counsel as he had been instructed to do.  (<u>Id.</u> at 85-86.)  It was his signature that appeared on the three pages of the Petition to Enter a Plea of Guilty.  (<u>Id.</u> at 88-89.)  He signed the petition in open court.  (<u>Id.</u> at 88-89.)  He did not understand what was meant when he was asked if anyone had made him any promises to get him to plead guilty or if anyone was forcing him give up his right to a trial.  (<u>Id.</u> at 94.)  He acknowledged that he pled guilty in 1990 to a reduced assault charge.  (<u>Id.</u> at 96.)  A subsequent charge had been dismissed when he was on probation for that conviction.  (<u>Id.</u>)  Part of his motivation in pleading guilty in the instant case was the additional tampering charge.  (<u>Id.</u> at 98.)

The motion court[3] found, among other things, that Petitioner had not pled guilty "simply because he had run out of money to pay his lawyer" and trial counsel's testimony that he had explained to Petitioner that he might qualify for the Public Defender and that

---

[3]The same judge presided over the post-conviction proceedings who had presided over the criminal proceedings.

he had not coerced Petitioner into pleading guilty was credible; that trial counsel's decision not to request a change of judge was a strategic decision from which Petitioner had suffered no prejudice; that Quinn's testimony at the evidentiary hearing was unimpressive and would not have made a difference even had trial counsel spoken with him; and that trial counsel clearly had not failed to investigate McNelly as a potential witness. (Resp't Ex. A at 176-88.) The court denied relief. (Id.)

Petitioner appealed on five grounds. (Resp't Ex. C.) First, he argued that trial court had erred in accepting his guilty plea because no facts were adduced at the change of plea hearing to show that he had been criminally negligent when driving the Firebird that night. (Id. at 26.) Second, he argued that his guilty plea was involuntary and unknowing because trial counsel's financial interest in obtaining payment for his legal services conflicted with Petitioner's interest in taking his case to trial and avoiding a criminal conviction. (Id. at 27.) Third, trial counsel was ineffective for not moving for a change of venue or judge and for pressuring him to plead guilty although he believed he could not get a fair trial before the same judge who had presided over the related civil proceedings. (Id. at 28.) Fourth, trial counsel was ineffective for failing to investigate Quinn as an expert material witness and, fifth, for failing to investigate McNelly as a material witness. (Id. at 29-30.)

The appellate court found no merit to any of these five arguments. (Resp't Ex. F.) Citing the statutory elements for involuntary manslaughter, Mo.Rev.Stat. § 565.024.1(2), second degree assault, Mo.Rev.Stat. § 565.060.1(4), and criminal negligence, Mo.Rev.Stat. § 562.016.5, the court held that Petitioner's admission in the written plea

that he had operated the car "under the influence of alcohol and did so with criminal negligence by going at a high rate of speed," causing a collision with a tree, two deaths, and physical injury to the third passenger, "provided ample support for a finding of criminal negligence." (Id. at 7.) The factual basis for the guilty plea was also provided by Petitioner's blood test showing a blood alcohol level above the legal limit and his admissions at the change of plea hearing that he had consumed alcohol before driving the Firebird, that he lost control of the car when he drove around a curve, that the car went off the road and struck a tree, that he might have been speeding at 90 mph, and that, as a result, two passengers were dead and one was injured. (Id.)

Addressing Petitioner's second point and noting Petitioner's answers at the plea hearing, the court found that there was no actual conflict of interest that adversely affected his trial counsel's performance. (Id. at 8-10.) His third point was without merit based on trial counsel's testimony about Petitioner not wanting a change of judge and his willingness to request one had Petitioner asked and on trial counsel's testimony about not wanting a change of venue because the alternative sites had less favorable jury pools. (Id. at 10-11.) Addressing Petitioner's last two points, the court found that trial counsel made a strategic decision not to call McNelly, whose preliminary hearing testimony he already had and whose relationship with Petitioner had deteriorated since that hearing, and that Petitioner never mentioned Quinn as an expert witness, nor would his testimony have made a difference in the outcome. (Id. at 11-12.)

Petitioner now seeks federal habeas relief on ten grounds. Those grounds are set forth below.

## Discussion

Ground One: Trial Counsel's Conflict of Interest. Petitioner first argues that he was denied his constitutional rights when trial counsel's financial interests caused him to pressure Petitioner to plead guilty. Specifically, Petitioner's inability to pay additional attorney fees created a conflict of interest between counsel's pecuniary interests and Petitioner's interest in taking his case to trial.

This claim was adjudicated on the merits by the state courts; hence, federal habeas relief may be granted only if those courts' decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2). Additionally, the factual determinations of the state courts are presumed to be correct "absent 'clear and convincing evidence' to the contrary . . . ." **Perry v. Kemna**, 356 F.3d 880, 883 (8th Cir. 2004) (quoting 28 U.S.C. § 2254(e)(1)). This presumption applies regardless of whether the factual determination is made by the state trial court or by the state appellate court. **Id.**

"[T]he Sixth Amendment right to counsel contains a correlative right to representation that is unimpaired by conflicts of interest or divided loyalties." **Smith v. Lockhart**, 923 F.2d 1314, 1320 (8th Cir. 1991); accord **Covey v. United States**, 377 F.3d

903, 906 (8th Cir. 2004). To prove that he was denied this right, "a petitioner must show both that his counsel's performance was deficient and that the deficiency prejudiced his defense." **Winfield v. Roper**, 460 F.3d 1026, 1039 (8th Cir. 2006) (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)). In the context of a guilty plea, the habeas petitioner "who pleads guilty upon the advice of counsel 'may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in [<u>Strickland</u>].'" **Hill v. Lockhart**, 474 U.S. 52, 56-57 (1985) (quoting <u>Tollett v. Henderso</u>n, 411 U.S. 258, 267 (1970)). Consequently, to establish prejudice from a counsel's deficient performance, the petitioner must show that he would not have pleaded guilty and would have insisted on going to trial but for that deficient performance. <u>See</u> **Wilcox v. Hopkins**, 249 F.3d 720, 722 (8th Cir. 2001); **Witherspoon v. Purkett**, 210 F.3d 901, 903 (8th Cir. 2000); **Nguyen v. United States**, 114 F.3d 699, 703-04 (8th Cir. 1997). <u>See</u> <u>also</u> **Wanatee v. Ault**, 259 F.3d 700, 703 (8th Cir. 2001) ("The prejudice inquiry in such cases 'focuses on whether counsel's constitutionally ineffective performance affected the outcome of the *plea process*.'" (quoting <u>Hill</u>, 474 U.S. at 58)).

The question of counsel's allegedly deficient performance need not be reached under *Strickland* if a petitioner has failed to show prejudice. <u>See</u> **Strickland**, 466 U.S. at 697; **Hoon v. Iowa**, 313 F.3d 1058, 1061 (8th Cir. 2002); **Siers v. Weber**, 259 F.3d 969, 974 (8th Cir. 2001). Thus, if a petitioner has failed to show that, but for an allegedly deficient performance by his trial counsel, there is a reasonable probability that he "'would not have

pleaded guilty and would have insisted on going to trial,'" his claim of ineffective assistance of counsel fails. **Gingras v. Weber**, 543 F.3d 1001, 1004 (8th Cir. 2008).

Prejudice from counsel's performance is presumed in three categories of ineffective-assistance claims. **Covey**, 377 F.3d at 906. One category is where counsel had an actual conflict of interest.[4] **Id.** at 907. "[W]here a defendant can show that 'an actual conflict of interest adversely affected his lawyer's performance,' [the court] will presume prejudice rather than require an affirmative showing by the defendant." **Winfield**, 460 F.3d at 1039 (quoting Cuyler v. Sullivan, 446 U.S. 335, 348 (1980)). This presumption of prejudice, however, has not been extended "beyond cases in which an attorney has represented more than one defendant." **Id.** Indeed, in **Mickens v. Taylor**, 535 U.S. 162, 174 (2002), the Supreme Court criticized an appellate court's decision applying the *Cuyler* presumption of prejudice to an ethical conflict between counsel's personal or financial interests and his representation of defendant. The Eighth Circuit Court of Appeals has held that the *Strickland* standard – a more rigorous one than *Cuyler*[5] – applies "where the alleged conflict involves ethical issues other than multiple or serial representation[.]" **United States v. Young**, 315 F.3d 911, 914 n.5 (8th Cir. 2003).

---

[4]The other two categories are when (a) there is an actual or constructive denial of the assistance of counsel and (b) the state has interfered in certain ways with counsel's assistance. **Strickland**, 466 U.S. at 692. Petitioner does not argue that his claim falls within either of these two categories.

[5]See **Winfield**, 460 F.3d at 1040 (holding that the *Cuyler* requirement of an adverse impact is less rigorous than the *Strickland* showing of prejudice).

Although the alleged conduct cited by Petitioner may not be evaluated under the presumption-of-prejudice standard of *Cuyler*, that does not eliminate the question whether he has established a claim under *Strickland*. He has not.

Petitioner claims that but for his trial counsel's alleged conflict of interest, he would not have been pressured into pleading guilty because he had no funds to retain an expert witness. The state court found that trial counsel's testimony that he had informed Petitioner that he might qualify for the Public Defender's Office and that he had not coerced Petitioner into pleading guilty was credible. "Federal habeas review 'gives federal courts no license to redetermine [the] credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'" **Perry**, 356 F.3d at 885 (quoting Marshall v. Lonberger, 459 U.S. 422, 434 (1983)) (alteration in original); accord **Prewitt v. Goeke**, 978 F.2d 1073, 1076 (8th Cir. 1992). Moreover, at the change of plea hearing, Petitioner had, under oath, informed the court that he was satisfied with his counsel's performance and that he had no complaints with that performance. These representations "carry a strong presumption of verity and pose a 'formidable barrier in any subsequent collateral proceedings." **Nguyen**, 114 F.3d at 703.

For the foregoing reasons, Petitioner's first ground is without merit.

Ground Two: Disqualification of Judge. Petitioner next argues that he was denied the effective assistance of trial counsel when trial counsel failed to move to disqualify the judge who presided over his criminal proceedings. This judge should allegedly have been disqualified because he had previously presided over the civil suit arising from the same

accident and therefore (i) had a personal interest in the criminal proceedings, (ii) could be a material witness at the criminal trial, and (iii) gave the appearance of impropriety by also presiding over the criminal proceedings.

As with Petitioner's first ground, this ground is defeated by the state court's credibility findings that Petitioner had not wanted a change of judge and that trial counsel would have requested one had Petitioner wished.

Grounds Three Through Seven: Procedural Default.  It is undisputed that Petitioner did not raise his next five grounds in a direct criminal appeal or in his post-conviction appeal.  These grounds are:  his due process rights were violated when the trial judge did not sua sponte recuse himself after presiding over the related civil case filed against Petitioner; his right to the effective assistance of trial counsel was violated when counsel did not make a "fruit of the poisonous tree" argument addressing the withdrawal of blood and the seizure of the sensory device module from the Firebird and when counsel abandoned a *Miranda* argument; his Fifth Amendment rights were violated when police failed to read him his *Miranda* rights, although he was in custody; his constitutional rights were violated when he was not read the charges during the change of plea proceedings; and his guilty plea was involuntary and unknowing because he pled to charges which failed to include that he "directly" committed a crime[6] and included speculative references

_____

[6]The complained-of language is the phrase "either acting alone or knowingly in concert with another" that appears in each of the counts in the Information.  (Resp't Ex. A at 8-9.)

to "other crimes."[7]   In answer to Respondent's argument that these grounds are procedurally barred by Petitioner's default, Petitioner contends that the fundamental miscarriage of justice exception commands that the defaulted grounds be reached on their merits.  He does not otherwise elaborate why this exception should apply.  He does further contend that grounds that should have been raised on direct appeal were not because his trial counsel abandoned him.

"Claims that have not been presented to the state courts, and for which there are no remaining state remedies, are procedurally defaulted." **Skillicorn v. Luebbers**, 475 F.3d 965, 976 (8th Cir.), cert. denied, 128 S.Ct. 297 (2007); accord **Echols v. Kemna**, 511 F.3d 783, 785 (8th Cir. 2007) ("If a petitioner has not presented his habeas corpus claim to the state court, the claim is generally defaulted." (internal quotations omitted)), cert. denied, 128 S.Ct. 2447 (2008).  See also **Interiano v. Dormire**, 471 F.3d 854, 856 (8th Cir. 2006) (claims not presented in Rule 29.15 motion or included in appeal are procedurally defaulted); **Osborne v. Purkett** , 411 F.3d 911, 919 (8th Cir. 2005) (claim raised in Rule 29.15 motion but not presented on appeal was procedurally barred); **Lyons v. Luebbers**, 403 F.3d 585, 593 (8th Cir. 2005) ("A section 2254 applicant's failure to raise a claim in state post-conviction proceedings results in procedural default of that claim."). "Unless a habeas petitioner shows cause and prejudice or that he is actually innocent of the charges, a court may not reach the merits of procedurally defaulted claims in which the

---

[7]The only "other" crime referenced in the Information is a previous conviction for second degree assault and includes the date of the guilty plea, the jurisdiction, and the case number. (See Resp't Ex. A at 8-9.)

petitioner failed to follow applicable state procedural rules in raising the claims." **Skillicorn**, 475 F.3d at 976-77; accord **Barnett v. Roper**, 541 F.3d 804, 808 (8th Cir. 2008); **Greer v. Minn.**, 493 F.3d 952, 957 (8th Cir.), cert. denied, 128 S.Ct. 672 (2007). "'[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" **Id.** at 957 (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)).  There is no exhaustive catalog of the objective impediments, nor have the precise contours of the cause requirement been clearly defined.  **Ivy v. Caspari**, 173 F.3d 1136, 1140 (8th Cir. 1999).  What has been established is that a "fail[ure] to raise a claim despite recognizing it, does not constitute cause for a procedural default." **Murray**, 477 U.S. at 486.  Clearly, Petitioner recognized at the trial level that he was not given his *Miranda* rights, that the trial judge who had presided over his civil case was now presiding over his criminal case, and that he had not been read the charges against him in the change of plea proceedings.  He also recognized the claim that his trial counsel abandoned his *Miranda* argument and did not raise a "fruit of the poisonous tree" argument – this claim was raised in his pro se amended post-conviction motion.  (See Resp't Ex. A at 105-06, 110, 115.)

In his traverse and supplemental traverse, Petitioner advances two explanations for his failure to present the claims in grounds three through seven, inclusive, to the state court.  First, insofar as his claims are those that challenge the actions of the trial court and

should have been raised in a direct criminal appeal,[8] Petitioner argues that he was abandoned by his trial counsel when counsel failed to file such an appeal. This explanation is unavailing because it was never presented to the state courts as an independent ground for relief. See **Clemons v. Luebbers**, 381 F.3d 744, 752 (8th Cir. 2004). Petitioner having failed to establish cause for his default, the question of prejudice need not be reached.[9] See **Schawitsch v. Burt**, 491 F.3d 798, 804 (8th Cir. 2007).

---

[8]It is possible that Petitioner's claims of trial court error would be considered waived by his guilty plea. In Missouri, a guilty plea ordinarily waives all defenses and errors; thus, in a direct appeal from a guilty plea, only the subject-matter jurisdiction of the trial court or the sufficiency of the information or indictment may be reviewed. See **State v. Goodues**, 277 S.W.3d 324, 326 (Mo. Ct. App. 2006); **State v. Phillips**, 204 S.W.3d 729, 730 (Mo. Ct. App. 2006). Claims of ineffective assistance of trial and appellate counsel, of lack of jurisdiction by the sentencing court, and of an impermissible sentence may be raised in a post-conviction motion. See Mo.S.Ct.R. 24.035(a). This Court need not reach the waiver question, however, or the question whether Missouri's fundamental fairness exception that allows trial court error to be raised in post-conviction proceedings, see **Dodds v. State**, 60 S.W.3d 1, 6 (Mo. Ct. App. 2001), applies because such questions are matters of state law, see **Estelle v. McGuire**, 502 U.S. 62, 67-68 (1991), and do not excuse or explain Petitioner's procedural default.

[9]Were the question of prejudice to be reached, it would be answered adversely to Petitioner. There is no showing of impropriety by the trial judge. The civil case was resolved by a settlement with the insurance company paying into the court the policy proceeds and the court dividing the funds among the claimants. His Fourth Amendment claims were argued in a motion to suppress and denied following an evidentiary hearing. "A Fourth Amendment claim is not cognizable on federal habeas review unless the state fails to provide 'an opportunity for full and fair litigation of [the] claim.'" **Palmer v. Clarke**, 408 F.3d 423, 437 (8th Cir. 2005) (quoting Stone v. Powell, 428 U.S. 465, 494 (1976)) (second alteration in original). "[A]n opportunity for full and fair litigation" is denied when (1) "the state provided no procedure by which the prisoner could raise his Fourth Amendment claim," or (2) "the prisoner was foreclosed from using that procedure because of an unconscionable breakdown in the system." **Poole v. Wood**, 45 F.3d 246, 249 (8th Cir. 1995); accord **Willett v. Lockhart**, 37 F.3d 1265, 1272 (8th Cir. 1994) (en banc). Petitioner was clearly *not* denied an opportunity to litigate his Fourth Amendment claim about the seized evidence. Moreover, the most damaging evidence against him was the sensory diagnostic module. The car the module was taken from did not belong to Petitioner; thus, the trial court correctly found he lacked standing to challenge the seizure. See **United States v. Barragan**, 379 F.3d 524, 529-30 (8th Cir. 2004).

Second, Petitioner argues that the merits of his defaulted claims should be reached to avoid a fundamental miscarriage of justice. "'[T]he miscarriage of justice exception is concerned with actual as compared to legal innocence.'" **Embrey v. Hershberger**, 131 F.3d 739, 741 (8th Cir. 1997) (en banc) (quoting Sawyer v. Whitley, 505 U.S. 333, 339 (1992)). "[I]n noncapital cases the concept of actual innocence is 'easy to grasp,' because 'it simply means the person didn't commit the crime.'" **Id.** (quoting United States v. Richards, 5 F.3d 1369, 1371 (10th Cir. 1997)). A showing of actual innocence requires new evidence and a "show[ing] that 'it is more likely than not that no reasonable juror would have convicted him in light of th[at] new evidence.'" **Osborne**, 411 F.3d at 920 (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). "'Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim.'" **Cagle v. Norris**, 474 F.3d 1090, 1099 (8th Cir. 2007) (quoting Schlup, 513 U.S. at 316).

Petitioner does not have any new evidence of his actual innocence.[10] The closest he comes is Quinn's testimony about the technical bulletins on brake problems in the Firebird. Quinn could not, and did not, opine whether those problems caused the accident.[11] On the other hand, the State's expert witness, who was well qualified and who testified at a preliminary hearing attended by Petitioner, and the Missouri Highway Patrol accident reconstructionist each opined that Petitioner was driving at an excessive rate of speed going – at least three times the posted limit – into a curve and that that was what caused the accident. Petitioner signed a petition stating, and affirmed, under oath in court, that he was intoxicated at the time of the accident and that his operation of the Firebird was criminally negligent.

---

[10]In a second supplemental traverse, Petitioner argues that the use of tap water to clean the site where blood was to be taken by the nurse at the hospital following the accident is new evidence to support his actual innocence. Attached to this traverse is a letter by an attorney addressing a concern that the use of tap water might increase the possibility of contamination of the blood sample. Also attached is a 1989 opinion by the Missouri Court of Appeals in **State v. Hanners**, 774 S.W.2d 568 (Mo. Ct. App. 1989), holding that the use of an *alcoholic* swab in the area where blood was to be drawn violated the statutory requirements of Mo.Rev.Stat. § 577.029 (repealed 2009) that "a non-alcoholic antiseptic" be used to clean the skin for a blood alcohol test. **Id.** at 569. Petitioner's proffer of the use of tap water is not new evidence. The nurse testified at the hearing on the motion to suppress that she used tap water in accordance with standard medical procedure; the Court of Appeals opinion requiring strict compliance with § 577.029 was issued in 1989. See **Roberson v. Vincent**, — S.W.3d —, 2009 WL 1748672, * 2 (Mo. Ct. App. 2009) (noting that statute was amended in June 2007 (the month before the date on the attorney's letter) to longer require the use of a non-alcoholic antiseptic and to require only that the withdrawal be "in strict accord with accepted medical practices"). That opinion did not, nor does any independent research reveal, that the use of tap water, a non-alcoholic liquid, would have violated § 577.029 in 2002 on the grounds that it is not an antiseptic.

[11]Quinn avers in an affidavit attached to Petitioner's first supplemental traverse that *if* the caliber bolts on the brakes were over-torqued, the defect "*could possibly* have affected" the Firebird's rear axle and "*could* have contributed" to the accident. He knew of other mechanics who "*possibly*" could have given similar testimony. Such speculation is neither new nor reliable.

Grounds three through seven, inclusive are procedurally barred.

Grounds Eight and Nine:  Ineffective Assistance of Trial Counsel.  Petitioner next argues that trial counsel was ineffective for failing to investigate Brad Quinn as an expert witness (ground eight) and Carla McNelly as a material witness (ground nine).  Neither argument has merit.

"The duty to investigate derives from an attorney's basic function, which is 'to make the adversarial testing process work in the particular case.'"  **Walls v. Bowersox**, 151 F.3d 827, 833 (8th Cir. 1998) (quoting Strickland, 466 U.S. at 690).  "'Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, . . . counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'"  **Id.** (quoting Kimmelman v. Morrison, 477 U.S. 365, 384 (1986)) (alteration in original).  "To prove prejudice from an attorney's failure to investigate potential witnesses, a petitioner must show that the uncalled witnesses would have testified at trial and that their testimony would have probably changed the outcome of the trial."  **Stewart v. Nix**, 31 F.3d 741, 744 (8th Cir. 1994).  See e.g., **Sherron v. Norris**, 69 F.3d 285, 290-91 (8th Cir. 1995) (trial counsel's decision not to call witness whose testimony would have been cumulative not ineffective assistance).

Petitioner showed at the post-conviction evidentiary hearing that Quinn would have testified at trial.  He did not show that Quinn's testimony would probably have changed

the outcome of the proceedings. Quinn, a mechanic and a GM plant trainer,[12] for three years, testified that technical bulletins issued by GM about the Firebird addressed the need to replace rear brake pads if the rear brakes made a "chirping" noise and the need to reduce the torque specifications for the brake calipers. He was only "somewhat" familiar with the rear brakes on a Firebird and could not offer an opinion on whether brake problems had caused the accident or on whether the accident reconstructionist's conclusion that the accident was caused by Petitioner driving drunk at an excessive rate of speed was accurate. He could, however, testify that he had been close friends with Petitioner for five years. See e.g. **Wilcox**, 249 F.3d at 723 (rejecting habeas petitioner's claim his trial attorneys were ineffective for persuading him to plead guilty before obtaining an expert's analysis of crime scene when retained defense expert could not determine crucial element of defense).

Petitioner has failed to show that McNelly would have testified at trial if called. Indeed, the evidence is the opposite. Petitioner's plea agreement required the State to dismiss a felony tampering charge and a misdemeanor telephone harassment charge against Petitioner – both charged lodged by McNelly. Petitioner did not refute trial counsel's testimony that McNelly was more favorably inclined to Petitioner at the preliminary hearing – testifying that he was not drunk that night, he was driving only 60 mph, and that she heard a clunk before crash – because she thought she was carrying his

---

[12]At the time of the evidentiary hearing, Quinn had been a plant trainer for three years. The change of plea hearing was eleven months earlier.

child and was less inclined by the time of the change of plea hearing because she had discovered the child was not his. This decrease in support is clearly evidenced by the tampering and harassment charges she initiated. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." **Armstrong v. Kemna**, 534 F.3d 857, 864 (8th Cir. 2008) (internal quotations omitted); accord **Evans v. Luebbers**, 371 F.3d 438, 445 (8th Cir. 2004); **Taylor v. Bowersox**, 329 F.3d 963, 971 (8th Cir. 2003).

Accordingly, trial counsel's failure to call Quinn or McNelly did not "so undermine[] the proper functioning of the adversarial process that the [change of plea proceeding] cannot be relied on as having produced a just result.'" **Jackson v. Gammon**, 195 F.3d 349, 354 (8th Cir. 1999) (quoting Kellogg v. Skon, 176 F.3d 447, 452 (8th Cir. 1999)).

Ground Ten: The Lack of a Factual Basis for His Guilty Plea. In his last ground, Petitioner argues that there was an insufficient factual basis to support his guilty pleas. Specifically, there was an insufficient basis to establish that he acted with criminal negligence, insufficient evidence that the sensory diagnostic module was accurate, and an improper use of the blood tests to establish an element of the offense and not just probable cause.

Petitioner pled guilty to two counts of first degree involuntary manslaughter and one count of second degree assault. Section 565.024.1(2), Mo.Rev.Stat., provides that "[a] person commits the crime of involuntary manslaughter in the first degree if he" "[w]hile in an intoxicated condition operates a motor vehicle . . . in this state and, when so

operating, acts with criminal negligence to cause the death of any person . . . ."  Section 565.060.1(4), Mo.Rev.Stat., provides that "[a] person commits the crime of assault in the second degree if he" "[w]hile in an intoxicated condition . . . operates a motor vehicle . . . in this state and, when so operating, acts with criminal negligence to cause physical injury to any other person than himself . . . ."  "A person 'acts with criminal negligence' . . . when he fails to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, and such failure constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."  Mo.Rev.Stat. § 562.016.5.  Petitioner affirmed when signing the Petition to Enter Plea of Guilty and affirmed when under oath in court that he operated the Firebird under the influence of alcohol and with criminal negligence by going around a curve at a high rate of speed, thereby colliding with a tree and causing the death of two people and injury to a third.  The state appellate court found the record provided a sufficient factual basis for his guilty plea to the three felonies.

Due process and the Sixth Amendment "require criminal convictions 'rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'"  **United States v. Gaudin**, 515 U.S. 506, 510 (1995); accord **Jackson v. Virginia**, 443 U.S. 307, 324 (1979); **Johns v. Bowersox**, 203 F.3d 538, 543 (8th Cir. 2000).  Under oath, Petitioner stated that he was guilty of every element of both felonies.  His statement was supported by evidence that he drove the Firebird at least 90 mph around a curve, when intoxicated, and that two people died and one was injured.  His tenth, and final, ground is without merit.

## Conclusion

Petitioner presents ten grounds for relief. For the foregoing reasons, consideration of the merits of five of those grounds is procedurally barred. The other five grounds were reached by the state courts and found to be without merit. This conclusion is not contrary to clearly established Federal Law, is not an unreasonable application of such law, and is not an unreasonable determination of the facts. Consequently, the other five grounds are also unavailing. Accordingly,

**IT IS HEREBY RECOMMENDED** that the 28 U.S.C. § 2254 petition of Scott Lynn Bragg be **DENIED** without further proceedings.

The parties are advised that they have **up to and including August 21, 2009**, by which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of August, 2009.